UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-----------------------------------------------------x
                                              :
GINA ARMSTRONG,                               :
   Plaintiff                                  :          3: 18 CV 580 (RMS)
                                              :
v.                                            :
                                              :
MARK MARTOCCHIO,                              :          DATE: APRIL 30, 2021
   Defendant                                  :
                                              :
-----------------------------------------------------x
```

MEMORANDUM OF DECISION

I.    BACKGROUND

The plaintiff, a commercial truck driver who is a resident of Texas,[1] commenced this § 1983 action on April 5, 2018 against the defendant Mark Martocchio, a police officer with the Bridgeport Police Department.  (Doc. No. 1). Specifically, she alleges that the defendant violated her constitutional rights under the Fourth Amendment by subjecting her to false arrest, malicious prosecution and unreasonable force. (*Id.*, ¶ 12). The claims arise out of the plaintiff's arrest on September 29, 2015 on Mountain Grove Street in Bridgeport, Connecticut. (*Id.*, ¶ 6).

The parties submitted their Rule 26(f) Report, which was adopted on June 6, 2018, and then there was no activity in the case until over a year later, on August 6, 2019, when the Court (Eginton, J.) issued a Rule 41(a) Notice to Counsel that the case was subject to dismissal as no action had been taken for six months.  (Doc. No. 13)  The next day, on August 7, 2019, the plaintiff filed a Motion for Setting a Date for Non-Jury Trial (Doc. No. 14), which the Court granted, and

---

[1] At the time she commenced this action, the plaintiff resided in Michigan. (Doc. No. 1), and at the time of the trial, she testified that she resides in Floydada, Texas.

on August 13, 2019, the parties consented to the jurisdiction of a Magistrate Judge; the case was transferred to the undersigned.  (Doc. No. 18).

On September 6, 2019, the Court held a telephonic status conference, scheduled a bench trial for March 24 and 25, 2020, and referred the parties to a different magistrate judge for settlement.  (Doc. Nos. 19-21). A settlement conference was scheduled for December 2019, and then rescheduled to January 2020. (Doc. Nos. 24-26).  The day before the January settlement conference, the Court (Richardson, J.) cancelled the conference after the parties reported that settlement discussions would not be productive. (Doc. No. 30; *see* Doc. Nos. 27, 29). Thereafter, the Court held a telephonic status conference on January 21, 2020 to address the upcoming trial dates. (Doc. Nos. 31-32).

During the conference call, defense counsel reported that the plaintiff's responses to the defendant's August 1, 2019 discovery requests remained outstanding and that, without this discovery, the defendant had no information about the plaintiff's damages and could not complete the plaintiff's deposition. (Doc. No. 33).  Accordingly, following the call, the Court permitted the defendant the opportunity to file a motion regarding the plaintiff's non-compliance if the plaintiff did not produce the responsive documents. (Doc. No. 33).  The Court extended the remaining pretrial deadlines but did not change the bench trial dates of March 24 and 25, 2020.  (*Id.*).

On February 28, 2020, the defendant filed a Motion to Dismiss, pursuant to Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure.  (Doc. No. 34).  On the same date, the Court issued an order directing the plaintiff to file her response by March 6, 2020 and stayed the pretrial deadlines. (Doc. No. 35). On March 6, 2020, the plaintiff filed an objection asking that the Court deny the defendant's motion to dismiss, and "respectfully suggest[ing]" that, "[s]hould the court be inclined to impose some sanction in this matter . . . that something short of dismissal of the case

would be appropriate." (Doc. No. 37 at 1). The plaintiff did not refute the allegations in the defendant's motion and acknowledged her failure to produce the requested discovery. (*Id.*). On March 9, 2020, the Court issued its Ruling denying the defendant's Motion to Dismiss but precluded the plaintiff "from producing any evidence at trial that ha[d] not been produced in response to the defendant's discovery requests, which include[d] evidence of the plaintiff's damages[.]" (Doc. No. 38).[2]

On March 16, 2020, due to "the risks posed by COVID-19, and the actions taken by the District of Connecticut continuing all in-court civil proceedings scheduled to take place on or before April 10, 2020, th[e] bench trial, [then] scheduled for March 24-25, 2020, [was] continued and all pretrial deadlines [were] stayed." (Doc. No. 41) (emphasis omitted). Following several telephonic status conferences, the bench trial was rescheduled to September 2-3, 2020 due to the limitations imposed by the COVID-19 pandemic. (Doc. Nos. 44-47). On July 31, 2020, the plaintiff moved to continue the bench trial to December 14-15, 2020 (Doc. No. 50; *see* Doc. Nos. 48-49, 51-52), and then, at the request of the plaintiff's counsel, the Court postponed the bench trial to February 2-3, 2021. (Doc. Nos. 53-57).

Upon consent of the parties, the bench trial was held before the undersigned on February 2, 2021, by videoconference utilizing Zoom videoconferencing technology. (*See* Doc. No. 57). The plaintiff and the defendant testified. (Doc. No. 68). On March 1, 2021, the defendant filed his post-trial brief (Doc. No. 72), and on March 2, 2021, the plaintiff filed her post-trial brief. (Doc. No. 73). The defendant filed a responsive brief on March 13, 2021. (Doc. No. 74).

---

[2] Additionally, the Court awarded the defendant reasonable expenses, including attorney's fees and costs, incurred in connection with the plaintiff's May 9, 2019 deposition and the filing of the motion to dismiss and directed the defendant to submit an affidavit totaling these reasonable expenses. (*Id.*). On March 10, 2020, the defendant filed his affidavit of itemized fees and costs totaling $1,439.50, (Doc. No. 39), and the Court awards the defendant this total amount as part of this ruling.

As explained herein, the Court concludes that the defendant had probable cause to arrest the plaintiff after she ignored the commands of the defendant and refused to move her truck which was creating a hazardous road condition.  Because there was probable cause for the arrest, the plaintiff's Section 1983 claim for false arrest fails.  *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).   Additionally, the plaintiff failed to carry her burden of establishing the elements of malicious prosecution.  *See Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009).  Thus, the Court need not address the question of whether the defendant is entitled to qualified immunity for his actions. Similarly, the plaintiff failed to establish that the defendant exercised excessive force. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Accordingly, judgment shall enter in favor of the defendant Mark Martocchio and, pursuant to the Court's previous sanction order, the defendant is awarded attorney's fees and costs in the amount of $1,439.50. (*See* Doc. Nos. 38-39).

II.   <u>FACTUAL FINDINGS</u>

Based on the entire record developed during trial, comprised of credible testimony and admitted exhibits, the following constitutes the Court's findings of fact pursuant to Fed. R. Civ. P. 52(a)(1):

The plaintiff, Gina Armstrong, is an over-the-road truck driver, specializing in the transportation of bulk hazardous chemicals; she lives Texas and has a Michigan commercial driver's license.  (Doc. No. 70 ["Trial Tr."] at 8, 22).  On September 29, 2015, the plaintiff was operating an 18-wheel tractor-trailer, making a delivery of liquid latex to the Sonic Corporation loading dock located at to 317 Mountain Grove Street in Bridgeport, Connecticut.  (*Id.* at 8-9). Mountain Grove Street is a heavily traveled two-way through street with a double yellow line

down the center of the road. (*Id.* at 68; *see* Ex. 503). The right side of the street houses two-and-three family houses, and the left side has industrial properties. (Doc. No. 70 at 68).

To unload her truck at the Sonic Corporation, the plaintiff explained that she utilized her considerable driving skills to negotiate her tractor-trailer into a loading dock designed to accommodate box trucks. (Trial Tr. at 25-26; *see id.* ("Q: . . .I want to ask you some questions about the parking job that you performed . . . A: I would really – I would really not bark up that tree if I were you, but if you want to, you may go ahead.")). The plaintiff parked her truck completely across Mountain Grove Street with the nose of the cab perpendicular with the far curb thereby temporarily blocking all traffic, requiring vehicles to find an alternate route because they could not pass. (Trial Tr. at 21; *see* Ex. 506).

The plaintiff explained that, after she parked her tractor-trailer to block the roadway in its entirety, she left the truck, took photographs of her parking job that she shared with her boss by text message (Ex. 506), had a coffee and doughnut as the truck was unloaded by dock workers, and then proceeded to inspect her truck after she was notified by the dock workers that she had oil on one of her tires. (Trial Tr. at 9, 28-29). The photograph of her parked truck is timestamped 2:39 p.m. (*See* Ex. 506; Trial Tr. at 20-21). While the plaintiff claims that the timestamp on the photograph reflected Central Standard Time so it was, in fact, 3:39 p.m. (Trial Tr. at 31), the Supplemental Police Report confirmed that the timestamp accurately reflected Connecticut local time. (*See* Ex. 507 at 4). At around 4:00 p.m., as the defendant patrolled his usual route that day, he came across the plaintiff's tractor-trailer obstructing the roadway and blocking cars from traveling down the road. (Ex. 507).[3] At that point, the plaintiff's tractor-trailer had been blocking the road for more than an hour and there were cars backed up on the road. (Ex. 506; *see* Trial Tr.

---

[3] The Bridgeport Police Department Incident Report reflects that the defendant's initial contact with dispatch occurred at 16:05:45 hours (4:05 p.m.). (Ex. 501).

at 71 ("[m]idblock I ran into a traffic jam[;] . . . there were two cars . . . that were stopped. . . . After approximately two minutes of the truck not moving, . . . I hit the air horn" causing the cars "to try to do a K-turn and back up out of [the] way.")).  As the plaintiff proceeded to inspect her truck, she "saw a police car sitting a ways down the road."  (Trial Tr. at 9-10).

The defendant explained that it was not unusual for the Sonic Corporation to receive deliveries from tractor-trailers, and he knew this because "Mountain Grove was on [his] daily route[, and he saw] trucks there all the time."  (Trial Tr. at 84).  The defendant further explained, however, "[w]hen [he] observed tractor-trailers at that loading dock, [the] truck[s] [were] backed all the way up, and they had tilted their cab[s] up to the left or to the right, which left one lane that was still passable. . . ." (*Id.*). As the defendant stated, "[o]ne lane passable is fine. Emergency vehicles can get through no problem. There's no issue." (*Id.*). The issue with the plaintiff's parking job, however, was that "the road was completely blocked. You couldn't get – you couldn't get a car through there or an emergency vehicle or a police vehicle if you had to." (*Id.*). Yet, upon inspection, the defendant observed that the plaintiff left "10 to 15 feet from the closed trailer doors to where the actual loading dock ramp was."  (*Id.* at 88). Thus, the plaintiff could have parked the truck closer to the loading dock so that one lane of traffic could have gotten past the truck; in other words, there was adequate room to unload the tractor-trailer without completely blocking Mountain Grove Street.

In addition to completely blocking the road, the plaintiff took no safety precautions to warn other drivers of the obstruction; there were no triangles placed in the roadway, and the police were not notified ahead of time to provide assistance. (*See* Trial Tr. at 39; Ex. 509 (CONN. GEN. STAT. § 392.22 (requiring the use of hazard warning signal flashers and placement of warning devices when a commercial motor vehicle is stopped upon the traveled portion of a highway or the shoulder

of a highway)).  The plaintiff emphasized that it was not her job to take any safety precautions.[4]

The plaintiff elaborated, "No safety thing occurred. And I blocked roads all over the country. . . .

This is not the first time I blocked a road; and, darling, it wasn't the last." (Trial Tr. at 58-59).

      As the defendant approached the plaintiff, he noticed that the engine of the tractor-trailer

was off, there was no one unloading the truck, and the only person he encountered was the plaintiff

who was texting as the defendant approached her. (*Id.* at 32, 74-75). The plaintiff explained that,

at that moment, she was in the "process of taking pictures" of a hub seal leak, "documenting it [to]

. . . e-mail the photographs into [her] company[.]" (*Id.* at 10).  The defendant testified that he asked

the plaintiff if it was her truck, and without looking up at him, the plaintiff responded, "Why?"

(*Id.* at 75). The plaintiff disputes that he asked her if it was her truck; she claims "[i]t was

abundantly clear" that it was her truck.  (*Id.* at 34).  The defendant testified that he told the plaintiff

that the truck had to be moved or he would ticket and tow the truck.  (*Id.* at 76). The plaintiff

testified that he told her to move her "f—ing truck[,]" and when she heard him say that, she was

"so shocked" that she "actually laughed" because she was "not used to people speaking to [her]

like that, especially a police officer."  (*Id.* at 11; *see* Ex. 508 at 47 (Q: Did he ask you if this was

your truck? A. Yes); *id.* at 48 (A. "he told me to move my f—ing truck."); *see* Trial Tr. at 37 ("I

laughed at him when he said to move my f—ing truck. I did laugh. I undoubtedly laughed. I thought

he was joking.")).  According to the plaintiff, it would be "against federal law" to move it at that

time, and she told the defendant as much.  (Trial Tr. at 37-38).

---

[4] She explained that when she contacted Sonic Corporation before arriving, she was told that they have "semis" deliver to their loading dock "all the time," and they block the road "once a week, if not once every two weeks." (Trial Tr. at 28).  According to the plaintiff, there was no need for cones because it was a "pretty large obstruction. I'm sure it's visible. Kind of hard to say you can't see it." (*Id.* at 30). Additionally, she acknowledged that when parked on a roadway, she is required to put hazard lights on, but she "wasn't parked on the roadway[,]" she was backed into a dock. (*Id.* at 39-40). Moreover, when asked if parking her truck in the manner in which she obstructed the road was "operating the vehicle safely[,]" the plaintiff stood by what she had done and said to defense counsel, "So exactly, please, please, with your experience, tell me how that could have been done safely." (*Id.* at 58).

The defendant then warned the plaintiff that if she did not move the truck, he would arrest her.  The plaintiff responded by telling the defendant, "Well, you can't arrest me for doing my job. There's actually laws that allow me to do exactly what I'm doing."  (*Id.* at 11).  Then, she pointed to the hub seal leak and "tried to explain that [she] had to document it and assess it for safety prior to the movement of the vehicle."  (*Id.*).  Though the defendant disputes that the plaintiff said anything about the defect, he explained that, when the plaintiff refused to move the truck, her tone was "very antagonistic and very sarcastic towards [him,]" and he could see that she was "hostile" and "very confrontational."  (*Id.* at 75-76). When the defendant repeated that, if the plaintiff did not move her truck, he would arrest her, she responded, "Well, I can't because, number one, I'm being unloaded. Number two, I have to document this and assess it for safety. . . . And you can't arrest me for doing my job."  (*Id.*).  Additionally, she "tried to explain federal law and federal delivery exemptions," and then called the State Police to request that a Department of Transportation ("DOT") officer respond to the scene. (*Id.* at 37-38, 45; *see id.* at 76).  The defendant then walked back to his patrol vehicle, radioed dispatch to request a cover unit based on "the plaintiff's attitude and demeanor[,]" and grabbed his summons book.  (*Id.* at 77; *see* Ex. 501).[5]

When the defendant returned, he asked the plaintiff for her driver's license, and he told her he was going to issue a summons for refusing to move the truck.  (*Id.* at 78).  The plaintiff refused to provide her license, told the defendant that he had no authority to ticket her, and repeated the DOT guidelines.  (*Id.*).[6] The plaintiff then turned her back to the defendant, attempted to call her

---

[5] The "Event Type" reported to dispatch states, "Hazardous Conditions-Road Hazard Officer" with the "Locations of 317 Mountain Grove Street." (Ex. 501).

[6] Although the plaintiff testified that the defendant did not ask for her license until she was handcuffed, and she did not want him to retrieve it from a secure spot in her truck (*id.*), the testimony is consistent that the plaintiff adamantly refused to produce her license at any time during the course of her encounter with the police, and her subsequent detention. Thus, the Court credits the defendant's testimony that he asked for her license shortly after arriving on the scene, and the plaintiff refused to produce it.

supervisor and tried to record the defendant on her phone.  (*Id.* at 45, 78).  At that point, the defendant grabbed her left arm, twisted it, and attempted to turn her to face him. (*Id.* at 79).  In doing so, the plaintiff claims that the defendant stepped on her foot, broke her shoe and caused her to suffer injuries to her foot, leg and knee. (*Id.* at 12).  When he placed the plaintiff in handcuffs, she started to scream, yell, and cause a scene which "made people come out of the building[.]" (*Id.* at 46, 80).  The plaintiff testified that she was handcuffed so tightly that her hands turned purple. (*Id.* at 13).

After the plaintiff was handcuffed and the defendant started walking her towards the street, a second police officer, the "cover officer[,]" Christina Arroyo, arrived on the scene.  (Trial Tr. at 81).  Officer Arroyo patted the plaintiff down, placed her in the rear of her patrol car, and transported her to the police station. (*Id.* at 47, 81).  At the station, despite repeated requests, the plaintiff refused to provide her name, but eventually provided her driver's license number. (*Id.* at 47). She insisted she was not breaking the law; she was just doing her job. (Trial Tr. at 13). She testified that she was "distressed and upset for being arrested for doing nothing more than [her] job." (*Id.* at 13).  According to the plaintiff, she asked the officers at the station to call the Connecticut DOT because the DOT "specialize[s] in the laws . . . which commercial vehicles are actually governed under . . . ."  (*Id.* at 13-14).

At around 6:00 or 7:00 a.m. the next day, the plaintiff was transported to a medical facility where she was told she had "sprains and strains" and "possible tears." (*Id.* at 14-15).  The plaintiff told the two officers who transported her that she was going to sue them, and when she arrived at the hospital, she asked the hospital staff to call reporters.  (*Id.* at 49; *see* Ex. 507).  Additionally, she told the defendant and Officer Arroyo that she was going to sue them as well.  (Trial Tr. at 47; *see* Ex. 507).

When she returned to police headquarters, she was arraigned by video.  (Trial Tr. at 15).

The plaintiff was charged with an infraction for improper parking, in violation of Conn. Gen. Stat.

§ 14-251[7] (Ex. 511), and interfering with an officer, in violation of Conn. Gen. Stat. § 53a-167a[8]

(Ex. 510).

The plaintiff asserted that she suffered economic damages, but upon questioning, she

testified that she lost her truck when she could not make the final $20,000 balloon payment at the

expiration of her lease. (Trial Tr. at 49-50).  The plaintiff had to return to Connecticut several times

to go to court and retain counsel at a cost of $5,000. (*Id.* at 16-17). Each time she traveled to

Connecticut, she lost about a week's worth of work hours.  (*Id.*at 17). On December 2, 2016, while

appearing before the Hon. Earl B. Richards in Superior Court in Bridgeport, Connecticut, all

charges were disposed of by the entry of an unconditional nolle.

## III.   CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to Fed. R. Civ. P.

52(a)(1):

---

[7] Conn. Gen. Stat. § 14-251. *Parking vehicles*. No vehicle shall be permitted to remain stationary . . . upon the traveled portion of any highway except upon the right-hand side of such highway in the direction in which such vehicle is headed; and, if such highway is curbed, such vehicle shall be so placed that its right-hand wheels, when stationary, shall, when safety will permit, be within a distance of twelve inches from the curb .. . . No vehicle shall be permitted to remain stationary within the limits of a public highway in such a manner as to constitute a traffic hazard or obstruct the free movement of traffic thereon, provided a vehicle which has become disabled to such an extent that it is impossible or impracticable to remove it may be permitted to so remain for a reasonable time for the purpose of making repairs thereto or of obtaining sufficient assistance to remove it.

[8] Conn. Gen. Stat. § 53a-167a. *Interfering with an officer: Class A misdemeanor or class D felony*. A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer, special policeman appointed under section 29-18b or firefighter in the performance of such peace officer's, special policeman's or firefighter's duties.

. . .

(b) Interfering with an officer is a class A misdemeanor, except that, if such violation causes the death of serious physical injury of another person, such person shall be guilty of a class D felony.

(Ex. 511).

On September 29, 2015, the plaintiff was arrested for interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a, and issued an infraction for improper parking, Conn. Gen. Stat. § 14-251.  At all relevant times, the defendant Mark Martocchio was a police officer employed by the Bridgeport Police Department and was acting within the scope of his employment.  At all relevant times, the defendant was acting under color of law.

A.      FALSE ARREST/MALICIOUS PROSECUTION UNDER § 1983

The "substantive analysis of . . . false arrest and malicious prosecution claims is virtually identical under § 1983 and the common law."  *Nodoushani v. S. Conn. State Univ.*, 95 A.3d 1248, 1254 (Conn. App. Ct. 2014) (footnote omitted) (citing *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (holding "[c]laims for false arrest or malicious prosecution, brought under § 1983 . . . are 'substantially the same' as claims for false arrest or malicious prosecution under state law")).

"To state a valid claim for false arrest or malicious prosecution under § 1983, a plaintiff must plead an unreasonable deprivation of liberty in violation of the Fourth Amendment and satisfy the state law elements of the underlying claims." *Walker v. Sankhi*, 494 F. App'x 140, 142 (2d Cir. 2012) (summary order).  The Fourth Amendment states, "The right of people to be secured in their person . . . against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause . . . ." U.S. Const. Amend. IV. "Section 1983 claims for false arrest and malicious prosecution are based on this Fourth Amendment right to be free from unreasonable seizures, including arrest and prosecution without probable cause."  *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 111 (D. Conn. Jan. 22, 2019) (citing *Soares v. Conn.*, 8 F.3d 917, 920 (2d Cir. 1993) ("It is settled that a person has a clearly established right not to be arrested or prosecuted without probable cause.")).   The burden of proving an unlawful arrest lies with the plaintiff, and "[i]n analyzing claims alleging the constitutional tort of false

arrest, 'we have generally looked to the law of the state in which the arrest occurred.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) (additional citations omitted)).

Under Connecticut law, "'[f]alse arrest[ ] is the unlawful restraint by one person of the physical liberty of another.'" *Outlaw v. City of Meriden*, 682 A.2d 1112, 1115 (Conn. App. Ct. 1996) (quoting *Green v. Donroe*, 186 Conn. 265, 267, 440 A.2d 973, 974 (1982)). The elements of a claim for false arrest "are: (1) the defendant arrested plaintiff or had plaintiff arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause." *Chase*, 360 F. Supp. 3d at 112 (citing *Marchand v. Simpson*, 16 F. Supp. 3d 97, 109 (D. Conn. 2014)).

"To prevail on a malicious prosecution claim under Connecticut law, a plaintiff must prove the following elements: (1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (additional citation and internal quotations omitted).

The only element contested in both claims is the lack of probable cause. "The existence of probable cause is a complete defense to claims of false arrest and malicious prosecution under both federal and Connecticut law." *Chase*, 360 F. Supp. 3d at 112 (citing *Williams v. Town of Greenburgh*, 535 F.3d 71, 78-79 (2d Cir. 2008); *Walczyk v. Rio*, 496 F.3d 139, 152 n. 14 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."); *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Probable cause to arrest exists when an officer has "knowledge

or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citations and internal quotations omitted); *see also Walczyk,* 496 F.3d at 156 ("[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."). "Because the existence of probable cause depends on the probability, rather than the certainty, that criminal activity has occurred, the validity of an arrest does not require an ultimate finding of guilt." *Johnson*, 496 F. Supp. 2d at 213 (citation omitted).

The plaintiff argues that federal law and regulations permit her to park her tractor-trailer blocking a through street, such as Mountain Grove Street. Specifically, 23 C.F.R. § 658.19(a) prohibits States from "enact[ing] or enforc[ing] any law denying reasonable access to vehicles . . . loading and unloading . . . to any truck tractor-semitrailer combination . . . ." (Ex. 110). According to the plaintiff, it would be "against federal law" to move her truck when the defendant told her to do so, and she told the defendant as much.  (Trial Tr. at 37-38).

The testimony was uncontroverted. There was no one outside other than the plaintiff when the defendant arrived, and the truck was no longer being unloaded. (*See* Trial Tr. at 45-46, 32, 74-75). Accordingly, 23 C.F.R. § 658.19(a) does not apply. If the tractor-trailer was being actively unloaded, as the plaintiff argues, there would have been dock workers outside when the defendant arrived on the scene, and the back of the truck would have been open. Both the plaintiff and defendant, however, testified that the workers came outside when the plaintiff started yelling because she was handcuffed by the defendant.

13

Moreover, at the time the defendant came upon the plaintiff, her truck was completely blocking the road, leaving no room for vehicles to pass.  (*See* Ex. 506).  Even if her truck was being actively unloaded and 23 C.F.R. § 658.19 applied, subsection (c) of 23 C.F.R. § 658.19 provides: "Nothing in this section shall be construed as preventing any State or local government from imposing any reasonable restriction, based on safety considerations, on access points of loading and unloading by any truck tractor-semitrailer combination . . . ."  23 C.F.R. § 658.19(c). Upon inspection, it was clear that the plaintiff left ten to fifteen feet between the closed trailer rear doors and the loading dock.  (Trial Tr. at 88; *see* Ex. 506).  As the defendant explained, when the tractor-trailer was towed from the scene, the wrecker driver was able to back the tractor-trailer about ten feet before he moved it forward and parked it on Mountain Grove Street.  The defendant explained that he has seen trucks backed into that location "all of the time. When [he] observed tractor-trailers at that loading dock, [the] truck[s] [were] backed all the way up, and they had their cab[s] up to the left or to the right, which left one lane that was still passable."  (Trial Tr. at 84). That was simply not the case here, which left a hazardous road condition that the defendant had the authority to remedy.  Despite that authority, the plaintiff insisted that she was entitled to block the road: "No safety thing occurred. And I blocked roads all over the country. . . . This is not the first time I blocked a road; and, darling, it wasn't the last."  (*Id.* at 58-59).

Although the plaintiff claimed that she could not have moved the truck because of the defect to the right side wheel hub,[9] the defendant claimed that the plaintiff told him only that she was unloading her truck and not that she had a mechanical failure that allegedly impeded her ability to move her truck.  (Trial Tr. at 76).  In response to the defendant's command to move the truck,

---

[9]The defendant testified that when the tow truck driver inspected the truck, he documented "grease on [right] wheel/hub[,]," determined he could drive it, and then, in fact, drove it from Mountain Grove Street back to the tow yard, approximately four miles away.  (Trial Tr. at 89; Ex. 102).

the plaintiff was "very antagonistic and very sarcastic," and the plaintiff's behavior was "hostile" and "very confrontational." (*Id.* at 75-76). The plaintiff told the defendant, "Well, you can't arrest me for doing my job. There's actually laws that allow me to do exactly what I'm doing." (*Id.* at 11). When the defendant repeated that if she did not move her truck, he would arrest her, the plaintiff responded, "Well, I can't because, number one, I'm being unloaded. Number two, I have to document this and assess it for safety. . . . And you can't arrest me for doing my job." (*Id.*). Rather than complying with the defendant's repeated commands, the plaintiff "tried to explain federal law and federal delivery exemptions," and then called the State Police to request that a DOT officer respond to the scene. (*Id.* at 37-38, 45; *see id.* at 76).

In light of the plaintiff's behavior, the defendant returned to his patrol car and radioed dispatch to request a cover unit. (Trial Tr. at 77; *see* Ex. 501).[10] When the defendant returned, he asked her for her driver's license, and he told her he was going to issue a summons for refusing to move the truck; the plaintiff refused to provide her identification. (Trial Tr. at 78). She continued to insist that the defendant had no authority to ticket her, and she repeated the DOT guidelines before turning her back to the defendant and attempting to call her supervisor and record the defendant on her cell phone. (*Id.* at 45, 78 ("Q: you also tried to record Officer Martocchio on . . . your phone? A: I did. Q: Instead of just moving your truck?")).[11] Prior to her arrest, the plaintiff, both in words and in action, refused to comply with the defendant's commands.

---

[10] The "Event Type" reported to dispatch states, "Hazardous Conditions-Road Hazard Officer" with the "Locations of 317 Mountain Grove Street." (Ex. 501).

[11] Although the plaintiff testified that the defendant did not ask for her license until she was handcuffed, and she did not want him to retrieve it from a secure spot in her truck *(*Trial Tr. at 78), the testimony is consistent that the plaintiff adamantly refused to produce her license at any time during the course of her encounter with the police, and her subsequent detention. Thus, the Court credits the defendant's testimony that he asked for her license prior to placing the plaintiff under arrest, and she refused to produce it.

Interfering with an officer is an infraction under Conn. Gen. Stat. § 53a-167a, which provides, "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer, special policeman appointed under section 29-18b or firefighter in the performance of such peace officer's special policeman's or firefighter's duties." The words

> obstruction, resistance, hindrance or endangerment . . . have a broad scope. By using those words it is apparent that the legislature intended to prohibit any act which would amount to meddling in or hampering the activities of the police in the performance of their duties . . . . The purpose of the statute, which has its origin in the common law, is to enforce orderly behavior in the important mission of preserving the peace; and any act that is intended to thwart that purpose is violative of the statute.

*State v. Silva*, 285 Conn. 447, 459-60 (2008) (quoting *State v. Aloi*, 280 Conn. 824, 832-33 (2007) (citation and internal quotation marks omitted)). The issue in this case is whether the plaintiff's actions rose to the level of illegal interference with an officer.

"'Connecticut courts most frequently find illegal interference with a police officer where the officer makes a direct request, which the defendant refuses to comply with, and it is that *refusal* that hinders or impedes the course of the investigation of the defendant or the performance of the officer's duties."' *Ruttkamp v. De Los Reyes*, No. 3:10 CV 392 (SRU), 2012 WL 3596064, at *7 (D. Conn. Aug. 20, 2012) (quoting *Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 168 (D. Conn. 2008), (citing *State v. Peruta*, 591 A.2d 140 (1991) (defendant convicted pursuant to section 53a-167a for refusing to comply with a direct order to move further back from the scene of a fatal automobile accident) (emphasis in original)). "'To avoid the risk of constitutional infirmity, [the Connecticut Supreme Court has] construe[d] § 53a[-]167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace."' *Id.* at *8 (quoting *State v. Williams,* 205 Conn. 456, 473 (1987)).  That said, the refusal to

comply with a police officer's request for identification may fall within the purview of § 53a-167a. *See Berg v. Sorbo*, No. 3:12-cv-00228 (MPS), 2014 WL 1117643, at *3 (D. Conn. Mar. 19, 2014) (noting "Connecticut's longstanding rule . . . thus remains that, *apart from disobedience to a direct police command*, § 53a-167a proscribes only physical conduct and fighting words, and does not extend merely to raising questions about a police officer's actions.") (internal quotations and citation omitted) (emphasis added). As discussed in *State v. Aloi*, 280 Conn. 824 (2007) and *State v. Silva*, 285 Conn. 447 (2008), such a refusal, in accordance with Conn. Gen. Stat. § 14-217, may involve precisely the "kind of disobedience and noncompliance" that brings the conduct within "section 53a[-]167a's reach." *Ruttkamp*, 2012 WL 3596064, at *7.

In *Aloi*, 280 Conn. at 826, the defendant was convicted of interfering with an officer in violation of section 53a-167a for refusing to provide his identification to a police officer who was investigating possible criminal activity pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)). That court concluded that the defendant's refusal to provide identification in connection with a *Terry* stop may hamper or impede a police investigation into apparent criminal activity. *Aloi*, 280 Conn. at 833-34. The court limited its holding, however, to the narrow facts "presented by the lawful *Terry* stop in [that] case." *Aloi*, 280 Conn. at 841 n.22. Thus, *Aloi* is not controlling here.

A year later, relying on its decision in *Aloi*, the court upheld a jury verdict for illegal interference where the defendant had refused to provide identification at the officer's request after the officer observed the defendant violating traffic laws. *Silva*, 285 Conn. at 456. In *Silva*, "the evidence established that the defendant was aware that the police were trying to issue [the defendant] an infraction ticket and that she refused to provide her identification and other motor vehicle documents to the officers." *Id.* at 460.

In this case, it is undisputed that the location of the tractor-trailer was impeding the flow of traffic on Mountain Grove Street, in violation of Conn. Gen. Stat. § 14-251, which specifically prohibits parking a truck across a two-lane road. At the time the defendant encountered the plaintiff, the tractor-trailer was not being unloaded. Additionally, the plaintiff acknowledged that the defendant asked her to move her truck, and she refused.  When asked for her driver's license, again the plaintiff refused.

The Court credits the defendant's version of the events, including that the plaintiff was insistent that she had a right to leave her truck where it was and that she did not have to comply with a police officer's orders.  Additionally, the Court finds that the plaintiff refused to comply with the defendant's repeated commands both to move the truck and to produce her identification, and she ignored him and turned her back to him. Moreover, it was clear that the plaintiff's defiant behavior did not end after she was taken into custody. At the station, despite repeated requests, the plaintiff refused to provide her name, but eventually provided her driver's license number. (Trial Tr. at 47).

The plaintiff's testimony and demeanor at trial was consistent with the defendant's description of his confrontation with her on the day of her arrest. When asked at trial about her behavior after she was taken into custody and, specifically, if she continued to refuse to identify herself once she was in Officer Arroyo's custody, the plaintiff refused to answer the question directly:

Q: But when asked, you refused to give her your name?

A: I believe my driver's license number is more sufficient than who I am.

Q: Right. You refused to give her your name when asked[,] right?

A: . . . What is the difference between my name or my driver's license number?

Q: Right. You refused to give her your name.

A: I gave her my driver's license number.

Q: You refused to give her your name when she asked for your name[,] correct?

A: I gave her my driver's license instead.

(Trial Tr. at 48). Even when the Court directed the plaintiff to answer the question, the plaintiff responded, "I gave her my driver's license number instead, that's correct." (*Id.* at 48-49). Additionally, when she was in custody, she continued to insist she was just doing her job, she was not breaking the law, and to further her point, she asked the officers at the station to call the Connecticut DOT because the DOT "specialize[s] in the laws . . . which commercial vehicles are actually governed under . . . ." (*Id.* at 13-14).

Under the facts of this case, there is no doubt that the defendant had probable cause to believe that the plaintiff committed the offense of interfering with an officer. It is well-established that, "[i]f an officer has probable cause to believe that an individual has committed even a very minor offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (noting that *Atwater* allows police officers to arrest individuals for even "minor misdemeanors and traffic offenses" without violating the Fourth Amendment). The defendant had probable cause to arrest the plaintiff for interfering with an officer by refusing to move her truck from illegally blocking the road, refusing to identify herself when requested, and walking away from the defendant when placed under arrest. Accordingly, because probable cause existed for the plaintiff's arrest, the plaintiff's claims for false arrest and malicious prosecution under 42 U.S.C. § 1983 fail.[12]

---

[12] In light of the conclusions reached herein and in Section II.B. *infra*, the Court need not address the issue of qualified immunity.

B.    <u>EXCESSIVE FORCE</u>

As the United States Supreme Court has made clear, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest . . .  of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis in original). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent of motivation." *Id.* at 397 (citations omitted).

The determination of whether a law enforcement officer's actions satisfy the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and internal quotations omitted).  Accordingly, all of the facts of the case must be considered, "including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether [s]he actively resisted the arrest" or attempted to evade arrest by flight.  *Ramos v. Town of E. Hartford*, No. 3:16 CV 166 (VLB), 2019 WL 2785594, at *7 (D. Conn. July 2, 2019) (citing *Graham*, 490 U.S. at 396) (additional citation omitted).  The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving––about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-

97 (citation omitted); *see also Brown v. City of New York*, 798 F.3d 94, 100-03 (2d Cir. 2015) (discussing Fourth Amendment standard for excessive force claims).

Applying the *Graham* factors to this case, the Court concludes that the plaintiff has not proven by a preponderance of the evidence that the force used by the defendant was excessive. The severity of the underlying crime was inarguably slight.  Officer Martocchio was investigating a parking violation and ultimately arrested the plaintiff for a misdemeanor offense.  The plaintiff's words and actions were defiant and, when the defendant told her she would be arrested, she turned her back on him, at which point he grabbed her arm to place her under arrest.  Though the plaintiff was yelling while the defendant placed her under arrest, there was no evidence that she was violent or threatening.  Though the plaintiff claims that the defendant stepped on her foot and broke her shoe, twisted her arm, shoulder, neck and back, "popped" her wrist, shoulder and knee, and placed the handcuffs so tightly on her that her hands turned purple (Trial Tr. at 12-13), she had no documented injuries.

That said, however, "[t]he 'core judicial inquiry' in an excessive force case is 'not whether a certain quantum of injury was sustained,' but rather whether unreasonable force was applied given the circumstances." *Barcomb v. Kraeger*, Civ. No. 3:14 CV 1159 (JBA), 2016 WL 2644885, at *4 (D. Conn. May 5, 2016) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). "It is well-established that the right to make an arrest accompanies with it the right to use some degree of physical coercion." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citing *Graham*, 490 U.S. at 396). The reasonableness of the handcuffing must be determined "in light of the minimal amount of force necessary to maintain custody" of the arrestee. *Esmont*, 371 F. Supp. 2d at 215 (citation omitted). In this case, the plaintiff was placed in handcuffs quickly and remained standing throughout the brief encounter.  In the act of placing her under arrest, the defendant

grabbed her arm and turned her to place her in a position to secure the handcuffs. The defendant's act of quickly turning the plaintiff's body to take her into custody directly resulted from the plaintiff's positioning; the plaintiff had turned her back to the defendant when he told her he was placing her under arrest. As the plaintiff testified, she was merely "thrown off balance." (Tr. Trial at 12). The sole medical record before the Court documented a left shoulder sprain, left wrist pain, which, as the plaintiff testified, was secondary to a previous wrist injury, and a neck sprain. (*Id.*; Ex. 103). "[S]prains or stains" are "relatively minor injuries[,]" *Berman v. Williams*, No. 17cv2757 (JGK), 2019 WL 4450810, at 7 (S.D.N.Y. Sept. 17, 2019), and the plaintiff produced no evidence of follow-up treatment or care.[13]

Moreover, while the plaintiff claims the handcuffs caused her hands to turn purple, she fails to establish that the defendant's actions constituted excessive force. "Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont*, 371 F. Supp. 2d at 214. "[I]n evaluating the reasonableness of handcuffing, a [c]ourt is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Id.* at 215 (citations omitted). In this case, the plaintiff did not complain of any injury caused by the handcuffs, nor did she request that they be loosened. Moreover, she has presented no evidence of injury to her wrists, *id.* (holding that "[[u]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to support a claim of excessive force from handcuffing."), and she did not support her claim that she experienced anxiety or emotional distress from this experience. (*See* Trial Tr. at

---

[13]As discussed in Section I *supra*, the plaintiff failed to produce medical or treatment records in response to discovery and was precluded "from producing any evidence at trial that ha[d] not been produced in response to the defendant's discovery requests, which include[d] evidence of the plaintiff's damages[.]" (Doc. No. 38).

62).   Thus, under the circumstances of this case, the plaintiff has not established by a preponderance of the evidence that Officer Martocchio's actions constituted excessive force.

IV.   <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the Clerk shall enter judgment in favor of the defendant Mark Martocchio and pursuant to the Court's previous sanction order, the defendant is awarded attorney's fees and costs in the amount of $1,439.50. (*See* Doc. Nos. 38-39).

Dated at New Haven, Connecticut, this 30th day of April, 2021.

  /s/ Robert M. Spector
Robert M. Spector
United States Magistrate Judge
